UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
W. TODD JENSEN,

                             *Plaintiff*,

              -against-

AR GLOBAL INVESTMENTS, LLC,
AR CAPITAL, LLC,
ARC ADVISORY SERVICES, LLC,
AMERICAN REALTY CAPITAL ADVISORS, LLC,
HEALTHCARE TRUST ADVISORS, LLC,
AMERICAN REALTY CAPITAL HEALTHCARE
TRUST III ADVISORS, LLC,
BELLEVUE CAPITAL PARTNERS, LLC and
AMERICAN REALTY CAPITAL II, LLC,

                          *Defendants*.
----------------------------------------------------------------X

19-cv-657

**COMPLAINT**

      Plaintiff W. Todd Jensen ("Jensen"), by his undersigned attorneys, alleges as

follows for his Complaint against AR Global Investments, LLC, AR Capital, LLC,

ARC Advisory Services, LLC, American Realty Capital Advisors, LLC,

Healthcare Trust Advisors, LLC, American Realty Capital Healthcare Trust III

Advisors, LLC, Bellevue Capital Partners, LLC, and American Realty Capital II,

LLC (sometimes collectively referred to herein as the "Company" or

"Defendants"):

## Introduction & Case Summary

1.     This case is brought under the Court's diversity jurisdiction. Defendants breached a written employment agreement to pay Plaintiff's earned wages and benefits, and are therefore liable for breaching the contract; and, by extension, for violating New York Labor Law Article 6.

2.     Plaintiff W. Todd Jensen was hired by the Company in 2011 as an executive.

3.     The parties' Employment Agreement required the Company to pay him an annual non-discretionary 4% profits bonus for two companies that he managed.

4.     It also required the Company to pay Jensen 12 months' severance, accrued benefits, and a pro rata share of his current year's profits bonus if the Company terminated him, *unless* the termination was for "Cause."

5.     The Employment Agreement contained a very narrow definition of "Cause."

6.     The Company missed the March 15, 2018 due date for paying Jensen's earned non-discretionary 4% profits bonus for 2017, allegedly because its 2017 financials hadn't been completed yet.

7.     In August 2018 the Company notified Jensen that his employment

was being terminated *not*-for-cause.

8.     Thereafter, the Company asked Jensen to sign a "Separation Agreement," even though the Employment Agreement did not require him to do so.

9.     Jensen pointed out that the Company's proposed "Separation Agreement" failed to mention the accrued vacation pay component of his earned post-termination wages and benefits.

10.     A disagreement then ensued as to how much unused vacation time Jensen accrued over the previous 7½ years, with the Company taking the position that its own HR records on the subject were inaccurate.

11.     Jensen told the Company he would go along with its new, lower vacation pay estimate to prevent any further delays in the payment of his substantial post-termination wages and benefits.

12.     However, the Company continued delaying payment of Jensen's earned post-termination wages and benefits, as well as his long-overdue 2017 profits bonus, which by that time the Company had already calculated.

13.     To explain the delay, the Company claimed it needed to continue reviewing Jensen's accrued vacation time to see if there were any further alleged inaccuracies in the amount of vacation pay it owed Jensen.

14.     Thereafter, in November 2018—months after the Company terminated him *not*-for-cause—the Company sent Jensen a letter purporting to "*recharacterize*" it as a "for Cause" termination, and took the position it was therefore entitled to permanently keep all of Jensen's earned bonuses, accrued benefits, and severance pay.

15.     The retroactive "re-termination" notice was made upon information and belief (i.e., "to the Company's knowledge").  In it, the Company alleged that "Cause" existed because four years earlier Jensen had allegedly neglected to discuss with his superiors some of the risks associated with a large investment opportunity.

16.     This alleged inattention to duty did not come close to meeting the Employment Agreement's strict definition of "Cause." Accordingly, to give itself a windfall, the Company purported to unilaterally change that definition in its retroactive "re-termination" notice.

17.     However, a party to a contract cannot re-write the contract to change the language it finds inconvenient.

18.     The Company's retroactive "re-termination" notice also failed to comply with the Employment Agreement's express precondition that Jensen be given "all evidence and information" upon which the Company's "Cause"

4

allegation was based, and an opportunity to cure the alleged breach.

19.     Defendants breached the Employment Agreement as a matter of law, having failed to satisfy *any* of the Employment Agreement's express pre-conditions to a "for Cause" termination. They are therefore liable as a matter of law for the payment of Jensen's:

(A)     earned, contractually-guaranteed and fully-vested 2017 "Profits Bonus" (which the Company calculated as $423,476);

(B)     earned, contractually-guaranteed and fully-vested 2018 "Accrued Profits Bonus";

(C)     earned, contractually-guaranteed and fully-vested "Accrued Benefits";

(D)     12 months of earned and contractually-guaranteed "Base Salary" (i.e., severance pay) totaling $550,000; and

(E)     attorney's fees (which the Employment Agreement requires the party in breach to pay).

20.     As detailed herein, Defendants are also liable for liquidated damages under New York Labor Law Article 6.

21.     "Plaintiff's cause of action under New York Labor Law is dependent upon the success of his breach of contract claim." *Walpert v. Jaffrey*, 127 F.Supp.3d 105, 135 (S.D.N.Y. 2015).

22.     Article 6, and § 193 in particular, reflects New York's "longstanding

policy against the forfeiture of earned but undistributed wages," *Bader v. Wells Fargo Home Mortg., Inc.*, 773 F. Supp. 2d 397, 415 (S.D.N.Y. 2011); *Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 109 (2018), and the amended version of § 198 commands that "*All* employees shall have *the right* to recover full wages, benefits and wage supplements and liquidated damages[.]"

### Jurisdiction & Venue

23.     This Court has diversity jurisdiction over Jensen's claims under 28 U.S.C. §1332(a)(1).  The amount in controversy exceeds $75,000, exclusive of interest and costs, and, as detailed below, there is complete diversity between the parties.

24.     The Company's principal place of business is at 405 Park Avenue, New York, New York 10022.

25.     The parties have also consented to jurisdiction in the State or Federal Courts of, *inter alia*, New York. See Ex. "1" hereto (Employment Agreement at Section 12(g)).

26.     The Employment Agreement also designates New York as the place of performance, see Ex. "1" hereto (Employment Agreement at Section 12(g)), and a substantial amount of the performance of the Employment Agreement occurred

in New York.

27.     The Employment Agreement is also governed by New York law, without regard to conflicts. See Ex. "1" hereto (Employment Agreement at Section 12(g)).

28.     The named Defendants also regularly conduct business in this District.

29.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2).


## The Parties

30.     Plaintiff W. Todd Jensen ("Jensen") is an individual domiciled in the State of Florida.

31.     Defendant AR Global Investments, LLC ("AR Global") is a Delaware limited liability company.

32.     Upon information and belief, AR Global's principal place of business is at 405 Park Avenue, New York, New York 10022.

33.     Upon information and belief, AR Global either has members who are domiciled in New York, North Carolina, Pennsylvania and/or Rhode Island, or in the alternative has one sole member which in turn has members who are domiciled in one or more of those states.

34.     Upon information and belief, no member of AR Global is domiciled

in Florida.

35.     Upon information and belief, AR Global is the successor business to AR Capital LLC ("ARC").

36.     AR Global is sued herein as a joint employer for purposes of the employment laws referenced herein, as the successor business to ARC, and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto), which provides in pertinent part that:  "All parties to this Amendment and their affiliates shall be jointly and severally responsible for the full performance of all payments, benefits and obligations to [Jensen]."  See also *All. for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 2018 U.S. App. LEXIS 35833, at *14 (2d Cir. Dec. 20, 2018) (defining "affiliate").

37.     Defendant AR Capital, LLC ("ARC") is a privately held Delaware limited liability company.

38.     Upon information and belief, ARC's principal place of business is at 405 Park Avenue, New York, New York 10022.

39.     Upon information and belief, ARC's members are domiciled in New York, North Carolina, Pennsylvania, Rhode Island, California and/or Virginia.

40.     Upon information and belief, no member of ARC is domiciled in

Florida.

41.     Upon information and belief, ARC is or was the successor in interest to American Realty Capital II, LLC.

42.     ARC is sued herein as a joint employer for purposes of the employment laws referenced herein, as a signatory to the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto) and March 7, 2016 (Ex. "4" hereto), and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto).

43.     Defendant Bellevue Capital Partners, LLC ("Bellevue Capital") is a Delaware limited liability company.

44.     Upon information and belief, Bellevue Capital's principal place of business is at 405 Park Avenue, New York, New York 10022.

45.     Upon information and belief, Bellevue Capital only has one member, and that member is domiciled in New York, Rhode Island or Virginia.

46.     Upon information and belief, no member of Bellevue Capital is domiciled in Florida.

47.     Upon information and belief, Bellevue Capital is the parent company of AR Global and ARC.

48.     Bellevue Capital is sued herein as a joint employer for purposes of the

9

employment laws referenced herein, and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto).

49.    Defendant ARC Advisory Services, LLC ("ARC Advisory") is a Delaware limited liability company.

50.    Upon information and belief, ARC Advisory's principal place of business is at 405 Park Avenue, New York, New York 10022.

51.    Upon information and belief, the only member of ARC Advisory is ARC or its successor in interest, AR Global Investments, LLC.

52.    Upon information and belief, no member of ARC Advisory is domiciled in Florida.

53.    ARC Advisory is sued herein as a joint employer for purposes of the employment laws referenced herein, as a signatory to the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto) and March 7, 2016 (Ex. "3" hereto), and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto).

54.    Defendant American Realty Capital Advisors, LLC ("ARCA") is a Delaware limited liability company.

55.    Upon information and belief, ARCA's principal place of business is at

405 Park Ave., New York, NY 10022.

56.     Upon information and belief, ARCA has two members, one of whom is domiciled in New York, and the other of whom is domiciled in North Carolina.

57.     Upon information and belief, no member of ARCA is domiciled in Florida.

58.     ARC Advisory is sued herein as a joint employer for purposes of the employment laws referenced herein, as a signatory to the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto) and March 7, 2016 (Ex. "3" hereto), and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto).

59.     Upon information and belief, Defendant Healthcare Trust Advisors, LLC ("HTI Advisor") is a Delaware limited liability company.

60.     Upon information and belief, HTI Advisor's principal place of business is at 405 Park Ave., New York, NY 10022.

61.     Upon information and belief, HTI Advisor either has members who are domiciled in New York, North Carolina, Pennsylvania and/or Rhode Island, or in the alternative has one sole member which in turn has members who are domiciled in one or more of those states.

62.     Upon information and belief, HTI Advisor has no member who is

11

domiciled in Florida.

63.     HTI Advisor is sued herein as a joint employer for purposes of the employment laws referenced herein, and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto).

64.     Upon information and belief, Defendant American Realty Capital Healthcare Trust III Advisors, LLC ("HCT III Advisor") is a Delaware limited liability company.

65.     Upon information and belief, HCT III Advisor's principal place of business is at 405 Park Ave., New York, NY 10022.

66.     Upon information and belief, HCT III Advisor has members who are domiciled in New York, North Carolina, Pennsylvania and/or Rhode Island, or in the alternative has one sole member which in turn has members who are domiciled in one or more of those states.

67.     Upon information and belief, HCT III Advisor has no member who is domiciled in Florida.

68.     HCT III Advisor is sued herein as a joint employer for purposes of the employment laws referenced herein, and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex.

"3" hereto).

69.     Upon information and belief, Defendant American Realty Capital II, LLC ("ARC II") is a Delaware limited liability company.

70.     Upon information and belief, ARC II's principal office is at 405 Park Ave., New York, NY 10022.

71.     Upon information and belief, ARC II either has members who are domiciled in New York, North Carolina, Pennsylvania and/or Rhode Island, or in the alternative has one sole member which in turn has members who are domiciled in one or more of those states.

72.     Upon information and belief, no member of ARC II is domiciled in Florida.

73.     ARC II is sued herein as a joint employer for purposes of the employment laws referenced herein, as a guarantor of the Company's performance of the Employment Agreement (Ex. "1" hereto at Section 13), and as an "affiliate" of the Company pursuant to Section 1 of the Employment Agreement, as amended December 29, 2015 (Ex. "3" hereto).

## Facts Common to all Causes of Action

74.     The below list of annexed true Exhibits are incorporated herein by

reference and provided for ease of reference:

Ex. 1:      The "Employment Agreement Between American Realty
            Capital Healthcare Advisors, LLC And W. Todd Jensen" dated
            February 17, 2011 (including the "Annex A" thereto and the
            "Amended and Restated Annex A" thereto).

Ex. 2:      The roughly contemporaneous one-page letter agreement
            amending the agreement attached hereto as Ex. "1".

Ex. 3:      The "Amendment To Employment Agreement Between ARC
            Advisory Services, LLC And W. Todd Jensen" dated December
            29, 2015.

Ex. 4:      The "Second Amendment To Employment Agreement Between
            ARC Advisory Services, LLC And W. Todd Jensen" dated
            March 7, 2016.

Ex. 5:      The Company's original Notice of Termination (not-for-cause)
            dated August 10, 2018.

Ex. 6:      The Company's draft Separation Agreement dated as of
            September 11, 2018.

Ex. 7:      Email chain reflecting the email communications between
            Jensen and the Company's General Counsel, Michael
            Anderson, from October 1, 2018 through October 9, 2018.

Ex. 8:      The Company's purported retroactive notice of termination
            (allegedly for "Cause") dated November 10, 2018.

Ex. 9:      Excerpts of the Company's 2018 Employee Handbook.

Ex. 10:     The Company's HR records as of August 18, 2018 reflecting
            Jensen's accrued unused vacation time and personal time.

Ex. 11:     The form 8-k that the Company filed with the Securities and Exchange Commission (which was not subsequently amended) stating that "The replacement of Mr. Jensen … [is] not the result of any disagreement between the Company and Mr. Jensen."

**The Nature of Defendants' Business**

75.     The named Defendants (also referred to herein as the "Company") were closely affiliated sponsors and advisors to three public, non-traded Real Estate Investment Trusts ("REITs") focusing primarily on healthcare-related assets, including medical office buildings and other healthcare-related facilities.

76.     The business of the three healthcare REITs was to acquire those properties to generate income and distribute that income as dividends to shareholders.

**The Parties' Relationship**

77.     Pursuant to an Employment Agreement described in greater detail below, Jensen was directly or jointly employed as an executive for the advisors of the three healthcare REITs, and also served as an executive for those healthcare REITs.

78.     The first of these three healthcare REITs was known as American Realty Capital Healthcare Trust.

79.    American Realty Capital Healthcare Advisors, LLC ("ARCHA") was a sponsor and advisor to that REIT.

80.    Jensen was ARCHA's Chief Investment Officer and Executive Vice President from February 17, 2011 until the first healthcare REIT was sold in or about January 2015.

81.    ARCHA is not named as a Defendant herein because it was removed and substituted as a party to the Employment Agreement when it was amended on December 29, 2015.  See Ex. "3" hereto at Section 1.

82.    The second healthcare REIT is known as Healthcare Trust Inc. ("HTI"), formerly known as American Realty Capital Healthcare Trust II, Inc.

83.    Healthcare Trust Advisors, LLC ("HTI Advisor") was an advisor to HTI.

84.    Jensen was employed as HTI Advisor's Chief Investment Officer and Executive Vice President from about April 24, 2014 until December 18, 2015, as HTI's Advisor's President from about December 18, 2015 until March 7, 2016, and then as HTI Advisor's interim CEO (and later CEO) until the Company served him with the notice of termination dated August 10, 2018 and held the same positions with HTI itself.

85.    The third healthcare REIT was known as American Realty Capital

16

Healthcare Trust III, Inc. ("HCT III").

86.    American Realty Capital Healthcare Trust III Advisors, LLC ("HCT III Advisor") was an advisor to HCT III.

87.    Jensen was employed as HCT III Advisor's Chief Investment Officer and Executive Vice President from about April 24, 2014 until December 18, 2015, as HCT III Advisor's President from about December 18, 2015 until March 7, 2016, and then as HCT III Advisor's interim CEO (and later CEO) until the Company served him with the notice of termination dated August 10, 2018 and held the same position with HCT III itself.

88.    Jensen also served as President and CEO of the healthcare REITs themselves (HTI and HCT III). See Ex. "4" hereto, Employment Agreement, as amended March 7, 2016, at Section 2(a).

**The Employment Agreement & The Company's Breach Thereof**

89.    Jensen and American Realty Capital Healthcare Advisors, LLC ("ARCHA") entered into an agreement dated February 17, 2011, "Employment Agreement Between American Realty Capital Healthcare Advisors, LLC And W. Todd Jensen."  Ex. "1" hereto.

90.    The "Employment Agreement Between American Realty Capital Healthcare Advisors, LLC And W. Todd Jensen" and the subsequent amendments

thereto are collectively referred to herein as the "Employment Agreement."

91.     The Employment Agreement called for an initial two-year term, followed by successive one-year renewal terms (Ex. "1" at Section 3), and automatically renewed for successive one-year terms on or about February 17, 2013, February 17, 2014 and February 17, 2015.  The Employment Agreement was thereafter amended to be terminable on 30 days' notice. See Ex. "3" at Section 3.

92.     Among other things, the Employment Agreement, prior to being amended, required the Company to make distributions to Jensen under paragraph 1(c) of the "Amended and Restated Annex A" attached thereto. Ex. "1" hereto. However, the Company made no such distributions to Jensen prior to 2015, despite (upon information and belief) having made distributions to the Company's equity owners that triggered the Company's obligation to make distributions to Jensen.

93.     Jensen believed this to be a violation of the Company's express contractual obligations and its duty of good faith under the Employment Agreement. He therefore provided the Company timely notice of non-renewal of the Employment Agreement in November 2015.

94.     Afraid of losing Jensen as an employee, the Company asked him to reconsider his decision, and asked if he would be willing to serve as President and CEO of the Company under a revised Employment Agreement.

18

95.     Jensen agreed to serve as President, and on December 29, 2015 the
Employment Agreement was amended pursuant to a signed "Amendment To
Employment Agreement Between ARC Advisory Services, LLC And W. Todd
Jensen." See Ex. "3" hereto.

96.     Under the parties' Employment Agreement, the Company was
required to pay Jensen an annual non-discretionary 4% Profits Bonus.  See Ex. "3"
at Section 4(b)(ii).

97.     On or about March 7, 2016 the Employment Agreement was again
amended, this time pursuant to a signed "Second Amendment To Employment
Agreement Between ARC Advisory Services, LLC And W. Todd Jensen,"
pursuant to which Jensen agreed to serve as CEO (interim or otherwise) of the
healthcare advisors (HTI Advisor and HCT III Advisor).  See Ex. "4" hereto.

98.     Under the Employment Agreement, the Company could terminate
Jensen's employment for any reason, but was required to pay him Accrued
Benefits, Accrued Profits Bonus, and 12 months of "Base Salary" as severance,
*unless*:

**(A)**     the termination was for "Cause," which the Employment
Agreement defines narrowly; *and*

**(B)**     the Company provided him (i) detailed written notice of
the alleged "Cause"; (ii) "all evidence and information"
upon which the Company made its allegation; *and* (iii) an
opportunity to cure.

19

Ex. "1" hereto at Section 5(b); Ex. "3" hereto at Section 5.

99.     Each year since 2011, Jensen's efforts helped generate significant fee revenue for the Company.

100.    March 15, 2018 was the due date of Jensen's earned, contractually-guaranteed and fully-vested Profits Bonus of 4% for 2017. See Ex. "3" at Section 4(b)(ii) (setting due date of the largely discretionary Annual Bonus as the due date for the entirely *non*-discretionary Profits Bonus) and Section 4(a)(vi) (confirming that March 15th is the due date of the largely discretionary bonus and, by extension, for the entirely *non*-discretionary Profits Bonus [Section 4(b)(ii)]).

101.    However, the Company didn't pay Jensen's 2017 Profits Bonus on March 15, 2018 on the grounds that its 2017 financials hadn't been completed yet.

102.    On August 10, 2018, the Company notified Jensen, verbally and in writing, that it was exercising its right to terminate his employment (*not*-for-cause). Ex. "5" hereto.

103.    Jensen specifically confirmed at the time with the Company that it was a *non*-cause termination.

104.    The Company also filed a form 8-k with the Securities and Exchange Commission (which was not subsequently amended) stating that "The replacement of Mr. Jensen … [is] not the result of any disagreement between the Company and

Mr. Jensen." Ex. "11" hereto.

105.   Shortly thereafter the Company asked Jensen to sign a separation agreement, even though he was not required to do so under the Employment Agreement.

106.   That draft separation agreement represented that Jensen would be paid for his past-due 2017 Profits Bonus, his 2018 Accrued Profits Bonus, and his 12 months of earned "Base Salary" as severance (Ex. "6"), but neglected to mention his accrued but unpaid vacation and personal days which the Employment Agreement also required the Company to pay.

107.   Jensen pointed out this omission and said he was open to entering into a separation agreement "assuming it can be done in a fair, positive and cooperative manner." Ex. "7" hereto.

108.   The Company responded by claiming that Jensen must have taken eight (8) more vacation days than what is reflected in the Company's own records. Ex. "7" hereto.

109.   Jensen told the Company he disagreed with its position, but was willing to accept eight (8) fewer days of accrued vacation pay since it was a small part of what the Company owed him. Ex. "7" hereto.

110.   However, instead of paying Jensen what it indisputably owed him, the

Company continued to withhold his past-due 2017 Profits Bonus (which the Company calculated as $423,476), as well as his accrued but unused vacation and personal days (which payment was due by September 10, 2018, 30 days after the notice of termination).

111.   Thereafter, the Company decided to permanently keep everything it owed Jensen.

112.   To justify giving itself this windfall, the Company scoured Jensen's employment history in search of anything that might be used to justify retroactively "re-terminating" Jensen for "Cause."

113.   Unable to find anything that came close to meeting the Employment Agreement's strict definition of "Cause," the Company was relegated to claiming that an alleged error in judgment constituted "Cause."

114.   Specifically, the Company sent a letter to Jensen—whose employment ended two months earlier—"*recharacteriz[ing]*" his termination as a "for Cause" termination because, "[t]o the Company's knowledge," four years earlier Jensen: **(A)** had allegedly neglected to notify top management of certain risk factors referenced in a 279-page due diligence report that had been provided in connection with a large investment opportunity, and **(B)** allegedly did not correctly report his vacation days.  Ex. "8" hereto.

22

115.   Even if that alleged error in judgment had occurred (which Jensen denies, as he discussed the findings of the due diligence report with his direct supervisor, then-CEO Tom D'Arcy), it would not have come close to meeting the Employment Agreement's strict definition of "Cause" because it did not constitute "criminal fraud, criminal embezzlement, or willful misconduct or breach of fiduciary duty as defined in governmental - regulations of REIT management." Ex. "1" hereto at Section 5(b).

116.   Knowing the alleged conduct did not meet the contract's strict definition of "Cause," the Company tried to substantially broaden that definition by claiming that the alleged conduct constituted "willful misconduct or breach of fiduciary duty" generally (which it did not in any event) rather than "willful misconduct or breach of fiduciary duty *as defined in governmental - regulations of REIT management*." Compare Ex. "1" at Section 5(b) (definition of "Cause") with Ex. "8" (the Company's retroactive termination notice purporting to unilaterally broaden the agreed-upon definition of "Cause").

117.   Further, as an express precondition to any "for Cause" termination, the Company had to provide "detailed written notice," together with "all evidence and information" upon which its allegation was based. Ex. "1" at Section 5(b).

118.   Instead of complying with these express preconditions, the Company only gave Jensen a cryptically-worded one-paragraph summary of the alleged

misconduct, which was merely asserted on information and belief (i.e., "to the Company's knowledge"). Ex. "8."

119.   The Company also failed to give Jensen an opportunity to cure the alleged breach, as the Employment Agreement expressly required. Ex. "1" at Section 5(b).

## First Cause of Action

## Breach of Contract

120.   Jensen incorporates the preceding paragraphs by reference.

121.   Jensen complied with his material obligations under the Employment Agreement, such that the Company had no legally cognizable excuse for depriving him of his earned and due Accrued Benefits, Profits Bonus, and severance pay.

122.   Having failed to satisfy *any* of the Employment Agreement's express pre-conditions for a "for Cause" termination, the Company breached the Employment Agreement as a matter of law.

123.   Although the Company's retroactive "re-termination" notice purported to broaden the contract's strict definition of "Cause," the Company is not allowed to unilaterally change the language it finds inconvenient.

124.   And even if it could, the phrase "willful misconduct or breach of

fiduciary duty" would have to be interpreted as referring to conduct "similar in nature" to "criminal fraud [and] criminal embezzlement[.]" *Trainum v. Rockwell Collins, Inc.*, 2017 U.S. Dist. LEXIS 83260, at *35-38 (S.D.N.Y. May 30, 2017) ("Section 11.8 joins together 'claims of fraud or willful misconduct,' thereby indicating that the two 'should be interpreted here as referring to conduct similar in nature.'").

125.   Moreover, *even if* the terms "willful misconduct or breach of fiduciary duty" weren't modified by qualifying language (which they are), and *even if* they weren't joined together with the terms "criminal fraud [and] criminal embezzlement" (which they are), the Company's position would *still* fail as a matter of law because "the mere failure of an employee to perform assigned tasks" does not establish a breach of fiduciary duty. *Cerciello v. Admiral Ins. Brokerage Corp.*, 90 A.D.3d 967, 968 (App. Div. 2011).

126.   Lest there be any doubt, the Employment Agreement *also* expressly provides that Jensen's duty to "adhere to all of the Company's policies, rules and regulations governing the conduct of its employees, including without limitation, the code of ethics, employee handbook and other policies adopted by the Employer Company … *shall not be used to deny [Jensen] any rights or benefits otherwise provided by this Agreement such as, for example, his rights, payments and benefits under Section[] … 5 of this Agreement*" (which governs the post-termination

25

payments to Jensen). See Ex. "3" hereto, Employment Agreement, Section 2(b) (as amended December 29, 2015).

127.    Further, the Company failed to provide Jensen with "detailed written notice" of the alleged "Cause" together with "all evidence and information" upon which its allegation was based, as the Employment Agreement required it to do. Ex. "1" at Section 5(b).

128.    Its retroactive "re-termination" notice was thus invalid for that reason as well because "it is clear under New York law that where, as here, a party seeks what amounts to a forfeiture, a notice of breach will be scrutinized and any inadequacy—be it trivial or material—will defeat such party's claim." *TV Tokyo Corp. v. 4Kids Entm't, Inc. (In re 4Kids Entm't, Inc.)*, 463 B.R. 610, 684 (Bankr. S.D.N.Y. 2011), citing *See Luxottica Group S.p.A. v. Bausch & Lomb Inc*., 160 F. Supp. 2d 545, 550-551 (S.D.N.Y. 2001); *See also Ulla-Maija, Inc. v. Kivimaki*, 2005 U.S. Dist. LEXIS 22249, *12 (S.D.N.Y. 2005); *Chinatown Apartments, Inc. v. Chu Cho Lam*, 51 N.Y.2d 786, 788 (1980).

129.    The retroactive "re-termination" notice was also invalid because it did not give Jensen an opportunity to cure the alleged breach, as the Employment Agreement expressly required. Ex. "1" at Section 5(b). *Drapkin v. Mafco Consol. Group, Inc.*, 818 F. Supp. 2d 678, 689 (S.D.N.Y. 2011).

130.   Surely the forfeiture of one's earnings based on mere inattention to duty cannot be justified under a contract that requires an opportunity to cure even "criminal fraud" before a forfeiture can occur.

131.   If the Company was unhappy with Jensen's performance, its sole remedy was to terminate him and pay him what it owed—the remedy it originally elected. Ex. "5" hereto.  It had no right to retroactively re-terminate him for "Cause."  See, e.g., *Ta-Chotani v. Doubleclick, Inc.*, 276 A.D.2d 313, 313 (App. Div. 2000) ("Defendant's claim that it terminated plaintiff's employment subsequent to her resignation is disingenuous, and the attempted retroactive termination is without effect.").

132.   Accordingly, the direct parties and signatories to the Employment Agreement (ARC Advisory, ARC, ARCA and ARC II) are liable for breach of contract, as are the affiliates and third-party beneficiaries named herein (AR Global, HTI Advisor, HCT III Advisor, Bellevue Capital, and ARC II). See Ex. "3" hereto at Section 1 ("All parties to this Amendment and their affiliates shall be jointly and severally responsible for the full performance of all payments, benefits and obligations to [Jensen].").

133.   AR Global, HTI Advisor, HCT III Advisor, Bellevue Capital, and ARC II are and were third-party beneficiaries of the Employment Agreement because the named Defendants are closely related and under common control (they

share and are controlled by overlapping officers and directors, including Nicholas

S. Schorsch, Edward M. Weil, Jr. and William Kahane) for a common purpose (to

raise money and generate profits for themselves and for investors), which is the

very reason the Employment Agreement expressly makes the affiliated entities

"responsible for the full performance of all payments, benefits and obligations to

[Jensen]." See Ex. "3" hereto at Section 1.


**Damages**

134.   As to the 2017 Profits Bonus, it was earned, contractually-guaranteed

and fully-vested as of March 15, 2018.  See Ex. "3" at Sections 4(b)(ii) and

4(a)(vi) (confirming March 15th due date).

135.   The Company calculated Jensen's 2017 Profits Bonus as $423,476 at

least five (5) weeks before the Company claimed it had "Cause" to terminate

Jensen's employment. See Ex. "7" hereto (email from the Company's General

Counsel, Michael Anderson, Esq., to Jensen dated October 4, 2011).

136.   As to the 2018 Accrued Profits Bonus, Section 5(c)(v) of the

Employment Agreement, as amended December 29, 2015, states that the Company

"shall pay and/or provide to [Jensen]":

> the proportionate share of the Profits Bonus through the Term
> date but unpaid to [Jensen], calculated and payable to [Jensen]
> at the same time it would have been had [Jensen's] employment

not been terminated (the "Accrued Profits Bonus")[.]

Ex. "3" hereto, at Section 5(c)(v).

137.   The Company repudiated the Employment Agreement by terminating Jensen without cause pursuant to a unilaterally altered definition of "Cause," and without complying with the Employment Agreement's other express preconditions to a "for Cause" termination.

138.   Accordingly, Jensen seeks an order requiring the Company to provide copies of the Healthcare Advisors' financials for 2018 no later than March 1, 2019 (Ex. "3" hereto at Section 4(b)(ii)), and a judgment requiring the Company to pay his earned, non-discretionary Accrued Profits Bonus.

139.   As to the Accrued Benefits, the Employment Agreement provides that following Jensen's termination the Company "shall pay and/or provide" Jensen, *inter alia*, Accrued Benefits (chiefly accrued but unused vacation and personal days). See Ex. "3" hereto at Section 5(c)(iii), which incorporates by reference Sections 4(c)(i) and (ii) of Ex. "1" hereto.

140.   Only recently did the Company institute a policy limiting the vacation and personal time that could be carried forward each year, but that change did not affect employees like Jensen, who began their employment prior to 2017. See Ex. "9" hereto.  As the new policy did not apply to him, Jensen accrued a substantial

amount of unused vacation and personal time and carried it forward from year to year. See Ex. "10" hereto.

141.   As of the date of his termination, Jensen is entitled to payment for accrued unused balances of Grandfathered Vacation Time totaling 744 hours for the years prior to 2018 and 120 hours for 2018, and Grandfathered Personal Time totaling 56 hours for the years prior to 2018 and 16 hours for 2018. See Ex. "10" hereto (the Company's HR records as of August 18, 2018).

142.   Upon information and belief, it is and was the Company' policy or practice to compute accrued vacation and personal time pay using the employee's final salary.  However, Jensen's accrued vacation and personal time pay cannot be computed with certainty until Jensen has confirmed that this is so.

143.   As to the severance pay, the Employment Agreement provides that Jensen is entitled to twelve (12) months of his Base Salary following termination. See Ex. "3" at Section 5(c)(vi).  Jensen's final Base Salary was $550,000 (see Ex. "4" hereto at second Section "2").

144.   To summarize, all of the named Defendants are liable for the payment of Jensen's:

(A)   earned, contractually-guaranteed and fully-vested 2017 "Profits Bonus" (Ex. "3" at Section 4(b)(ii)), which the Company calculated as $423,476;

(B)  earned, contractually-guaranteed and fully-vested 2018
     "Accrued Profits Bonus" (Ex. "3" at 5(c)(v));

(C)  earned, contractually-guaranteed and fully-vested
     "Accrued Benefits" consisting of 864 hours of accrued
     vacation pay and 72 hours of accrued personal time pay
     (Ex. "3" at Section 5(c)(iii) and Ex. "1" at Section 4(c)(i)
     and (ii));

(D)  12 months of earned and contractually-guaranteed "Base
     Salary" (i.e., severance pay) totaling $550,000 (Ex. "3" at
     Section 5(c)(vi) and Ex. "4" hereto at Section 2); and

(E)  Attorney's Fees (Ex. "1" at Section 9(b)).

## Second Cause of Action

### Failure and Refusal to Pay Jensen's Earned, Contractually-Guaranteed and Fully-Vested 2017 Profits Bonus in Violation of New York Labor Law (NYLL) §§ 190, 193, 198(3) and 198(1-a)

145.   Jensen incorporates the preceding paragraphs by reference.

146.   The Company's liability under NYLL Article 6 flows from its liability

under the Employment Agreement. *Walpert v. Jaffrey*, 127 F.Supp.3d 105, 135

(S.D.N.Y. 2015).

147.   Under the Employment Agreement, Jensen is entitled to recover his

earned, contractually-guaranteed and fully-vested Profits Bonus of 4% for 2017.

That bonus is 100% *non*-discretionary. See Ex. "3" at Section 4(b)(ii).

148.   The non-discretionary Profits Bonus was an integral part of Jensen's

31

compensation for the work he performed; so integral, in fact, that Jensen, after having given his notice of non-renewal of the Employment Agreement, would not have agreed to be re-employed unless the Company agreed to pay a 100% non-discretionary 4% Profits Bonus, which it agreed to do. Ex. "3" hereto.

149.   March 15, 2018 was the due date of the 2017 Profits Bonus. See Ex. "3" at Section 4(b)(ii) (setting March 15th due date of largely discretionary Annual Bonus as the due date for the entirely *non*-discretionary Profits Bonus) and Section 4(a)(vi) (confirming that March 15th is the due date of the largely discretionary bonus and, by extension, for the entirely *non*-discretionary Profits Bonus [Section 4(b)(ii)]).

150.   The Company didn't pay Jensen's earned, contractually-guaranteed and fully-vested 2017 Profits Bonus on March 15, 2017 on the ground that its 2017 financials hadn't been completed yet.

151.   The Company later calculated Jensen's 2017 Profits Bonus to be $423,476.  It did so on or before October 4, 2011, at least five (5) weeks before it asserted that there existed an alleged "Cause" to terminate Jensen's employment. See Ex. "7" hereto (email from the Company's General Counsel, Michael Anderson, Esq., to Jensen).

152.   Jensen's 2017 Profits Bonus was expressly based on the results he

32

achieved as President and CEO for two specific healthcare advisors (HTI Advisor and HCT III Advisor) which served as critical profit centers for the Company.

153. As President and CEO, Jensen's responsibility for the profitability of HTI Advisor and HCT III Advisor was so paramount that Jensen agreed to also serve as, and did serve as, President and CEO of the two healthcare REITs that those entities advised (HTI and HCT III). See Ex. "4" at Section 1 (amending Section 2(a) of Ex. "1").

154. Labor Law Article 6, and § 193 in particular, reflects New York's "longstanding policy against the forfeiture of earned but undistributed wages." *Bader v. Wells Fargo Home Mortg., Inc.*, 773 F. Supp. 2d 397, 415 (S.D.N.Y. 2011); *See also Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 109 (2018).

155. NYLL § 193 provides that "No employer shall make any [unauthorized] deduction from the wages of an employee[.]"

156. The inequity the Legislature sought to prevent in enacting § 193 was employers reaping the benefit of employees' earned wages. *Matter of Angello v. Labor Ready, Inc.*, 7 N.Y.3d 579, 586 (2006).

157. A bonus is earned (and therefore a "wage") where, as here, it is non-discretionary and there is a relationship between the plaintiff's efforts and the profits of the business. See *Friedman v. Arenson Office Furnishings Inc.*, 129

A.D.3d 525, 525 (App. Div. 2015); *Grober v. Bronson*, 2013 N.Y. Misc. LEXIS 696, at *21 (N.Y. Sup. 2013); *Fischkoff v. Iovance Biotherapeutics, Inc.*, 2018 U.S. Dist. LEXIS 112839, at *13-14 (S.D.N.Y. July 5, 2018).

158.   In addition, to the extent Jensen's Profits Bonus could be characterized as a form of "incentive compensation," "An employee's incentive compensation is 'earned' when [as here] the employee acquires a vested interest in the award and its payment is not conditioned upon some occurrence or left to the discretion of the employer." *Aledia v. HSH Nordbank AG*, 2009 U.S. Dist. LEXIS 24953, at *6-7 (S.D.N.Y. Mar. 23, 2009); *DeWitt Stern Grp., Inc. v. Eisenberg*, 257 F. Supp. 3d 542, 591 (S.D.N.Y. 2017), *aff'd* 734 F. App'x 48 (2d Cir. 2018); *Fischkoff, supra* (involving a valid § 193 claim far less strong than Jensen's because it involved a partly-discretionary/partly-non-discretionary incentive compensation "program," and it was not so integral to the plaintiff's overall employment compensation that the plaintiff refused to be employed unless he received it; the court denied dismissal because "As Vice President and Chief Medical Officer of Lion, Plaintiff held a senior-level position. It is, therefore, plausible that the 'Company' objectives on which the Incentive Compensation depends are tied to Plaintiff's individual performance.").

159.   "Once the compensation is earned or vested, an employer's 'neglect to pay' those 'wages' violates NYLL § 193." *Quinones v. PRC Mgmt. Co. LLC*, 2015

34

U.S. Dist. LEXIS 88029, at *13-16 (S.D.N.Y. July 7, 2015), citing *Ryan v Kellogg Partners Inst. Servs.*, 19 N.Y.3d 1, 16 (2012); *Kieper v. The Fusco Grp. Partners Inc.*, 152 A.D.3d 1030, 1033 (App. Div. 2017); *Fischkoff*, *supra*, at *11-12 ("In determining whether compensation constitutes 'wages' under the NYLL, 'the dispositive factor . . . is not the labeling of the plan but whether the compensation is vested and mandatory as opposed to discretionary and forfeitable.'").

160.    Moreover, NYLL § 198 was amended after the Court of Appeals decision in *Gottlieb v. Kenneth D. Laub & Co.*, 82 N.Y.2d 457 (1993) to command unequivocally that "All employees shall have the right to recover full wages, benefits and wage supplements[.]" NYLL 198(3).

161.    Jensen's 2017 Profits Bonus constitutes a "wage" under NYLL §§ 190(1), 193, 198(3) and 198(1-a) because it was earned, contractually-guaranteed and fully-vested.

162.    While a number of courts have held that NYLL § 193 doesn't bar "merely the total withholding of wages" (as if keeping *all* of an employee's pay is somehow *less* harmful than keeping part of it), see, e.g., *Gold v. Am. Med. Alert Corp.*, 2015 U.S. Dist. LEXIS 108122, at *5 (S.D.N.Y. Aug. 13, 2015), there are at least three reasons why that interpretation should not be adopted.

163.    First, doing so would violate the text and purpose of Article 6, and §

35

193 in particular. See generally "Labor Law Article 6: Is There a Difference Between 'Deducting' and 'Failing to Pay' Wages?", *New York Law Journal*, Nov. 14, 2018.

164.   Second, since the New York Court of Appeals in *Ryan* held that a "neglect to pay" a bonus that constitutes "wages" violates § 193, an inconsistent ruling would violate the Second Circuit's admonition that a federal court sitting in diversity "must follow" the holdings of the New York Court of Appeals and "must reject" inconsistent rulings. *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 253 (2d Cir. 2002).

165.   Third, § 193's bar against unauthorized deductions must be construed in a manner consistent with § 198's command that "All employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages" because "[t]he different parts of the same act, though contained in different sections, are to be construed together as if they were all in the same section[.]" *Cook v. Carmen S. Pariso*, 287 A.D.2d 208, 215 (App. Div. 2001).

166.   In addition, § 198's command that "All employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages" must be given effect because "legislation is to be interpreted so as to give effect to every provision." *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 587 (1998). See also *Commonwealth of the N. Mar. I. v. Canadian Imperial Bank*

36

*of Commerce*, 21 N.Y.3d 55, 61 (2013) ("It is a well settled tenet of statutory construction that '[t]he Legislature, by enacting an amendment of a statute changing the language thereof, is deemed to have intended a material change in the law.'"); *Tini v. AllianceBernstein L.P.*, 108 A.D.3d 409, 410 (App. Div. 2013) (treating the amended version of § 198 as a source of substantive rights); *Cavalotti v. Daddyo's BBQ, Inc.*, 2018 U.S. Dist. LEXIS 154918, at *40-41 (E.D.N.Y. Sep. 8, 2018) (discussing split of authority on issue); *Becker v. Huss Co., Inc.*, 43 N.Y.2d 527, 540-41 (1978) (clarifying that labels such as "remedial" and "substantive" are not very important in construing statutory amendments).

167.    Accordingly, for failing and refusing to pay Jensen's earned, contractually-guaranteed and fully-vested 2017 Profits Bonus, which the Company previously calculated as $423,476, Defendants are liable under NYLL §§ 190, 193, 198(3) and 198(1-a) in an amount not less than $423,476, together with liquidated damages and attorney's fees.

### Third Cause of Action

**Failure and Refusal to Pay Jensen's Earned, Contractually-Guaranteed and Vested 2018 Accrued Profits Bonus in Violation of NYLL §§ 190, 193, 198(3) and 198(1-a)**

168.    Jensen incorporates the preceding paragraphs by reference.

169.    As the Company repudiated the Employment Agreement, it is liable

under NYLL §§ 190, 193, 198(3) and 198(1-a) for Jensen's earned but unpaid non-discretionary Accrued Profits Bonus for 2018, as well as liquidated damages and attorney's fees.

## Fourth Cause of Action

### Failure and Refusal to Pay Jensen's Earned and Contractually-Guaranteed Accrued Benefits and Severance Pay in Violation of NYLL §§ 190, 193, 198(3) and 198(1-a)

170.   Jensen incorporates the preceding paragraphs by reference.

171.   NYLL § 190(1) defines "wages" to include "benefits and wage supplements as defined" in Labor Law § 198-c, and § 198-c(2) defines "benefits and wage supplements" as including "vacation [and] separation … pay." Accordingly, Jensen's Accrued Benefits and severance pay are within § 190(1)'s definition of "wages."

172.   Since an employer's "neglect to pay" a sum that constitutes a "wage" violates § 193, *Ryan*, *supra*, Defendants' failure and refusal to pay Jensen's Accrued Benefits and severance pay violated § 193, as well as § 198, which states that "*All employees* shall have the right to recover full wages, *benefits and wage supplements* and liquidated damages[.]" NYLL § 198(3).

173.   However, the existence of NYLL § 198-c—an inapplicable *criminal* statute that contains the definition of "benefits and wage supplements" that §

38

190(1) borrows—has proved a stumbling block to a clear understanding of how the

pieces of the Article 6 puzzle fit together. Section 198-c has three subsections:

- § 198-c(1) authorizes jail time and criminal fines against employers who fail to pay employees' benefits or wage supplements.

- § 198-c(2) contains a definition of benefits and wage supplements (i.e., the definition that § 190(1) borrows).

- § 198-c(3) states that "*[t]his section* shall not apply to any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of [$900] a week."

174.   Presumably because of the confusing way in which Article 6 is

organized, most Article 6 claims for benefits or wage supplements are erroneously

filed under § 198-c (which does *not* provide a private right of action because it is a

*criminal* statute), and are therefore correctly dismissed.  See, e.g., *Raffe v. Am.*

*Nat'l Red Cross*, No. 5:08-cv-00211, 2011 U.S. Dist. LEXIS 137340, at *23

(N.D.N.Y. Nov. 30, 2011); *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346,

371 (E.D.N.Y. 2011).

175.   However, there are also cases that go much further, mistaking the very

existence of § 198-c(3)'s exclusion from *criminal* liability as something that

precludes recovery under *separate* provisions of Article 6. See, e.g., *Wagner v.*

*EdisonLearning, Inc.*, 2009 U.S. Dist. LEXIS 32965, at *10 (S.D.N.Y. Apr. 17,

2009).

39

176.   Those cases conflict with the views of the Court of Appeals and the Second Circuit, both of which have correctly interpreted § 198-c(3)'s exclusion as applying *solely* to § 198-c.

177.   The Court of Appeals in *Pachter v. Hodes Group, Inc.*, 10 N.Y.3d 609, 615-16 (2008) held that executives are employees under Article 6 "except where expressly excluded."

178.   To support that holding, the Court of Appeals relied on the fact that other sections of Article 6, such as § 198-c(3), "*contain*" the exclusions they reference. *Id.* See also *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 1995 WL 737929, at *15, n.11 (W.D.N.Y. 1995) ("[t]he primary definition of 'contain' is 'to keep within limits: hold back or hold down: as a: RESTRAIN, CONTROL *** b: CHECK, HALT, WITHSTAND, STEM ***[.]'"); *Miteva v. Third Point Mgmt. Co., L.L.C.*, 323 F. Supp. 2d 573, 579 (S.D.N.Y. 2004) (Marrero, J.) ("[§ 198-c] makes exclusions that are specifically for purposes of *that section* only.") (emphasis in original).

179.   Executives are not "expressly excluded" (*Pachter*, *supra*) from recovery under civil statutes such as §§ 193 and 198; rather, they are expressly *included*, because the amended version of § 198 states that "*All* employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages[.]" NYLL § 198(3).

180.   Similarly, the Second Circuit observed that "the limitation [in § 198-c(3)] appears to apply only to that particular section." *Pachter v. Bernard Hodes Group, Inc.*, 505 F.3d 129, 132, n.3 (2d Cir. 2007).

181.   Ironically, however, cases such as *Wagner*, *supra*, have unwittingly stood *Pachter's* core teaching on its head. Instead of holding that executives are employees under Article 6 "except where expressly excluded" (*Pachter*, 10 N.Y.3d at 615-16), and that § 198-c "*contains*" the exclusion it references (*Id.*), such cases have impliedly held with little or no analysis that § 198-c(3)'s *criminal* liability exclusion should be used to shelter offending employers from civil claims brought under *separate* sections of Article 6. See, e.g. *Fraiberg v. 4Kids Entm't, Inc.*, 75 A.D.3d 580, 583 (App. Div. 2010) (misinterpreting *Pachter's* reference to § 198-c with no analysis to support its decision).

182.   Besides conflicting with the Court of Appeals' and Second Circuit's shared understanding that § 198-c(3)'s exclusion is self-contained, cases such as *Wagner* and *Fraiberg* create an irreconcilable conflict with § 198's command that "*All* employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages[.]"

183.   Additionally, if § 198-c(3)'s exception to *criminal* liability were construed as sheltering offending employers from *civil* liability under separate sections of Article 6, then Labor Law § 194 (the New York Equal Pay Act) would

41

not prohibit employers from providing similarly situated executives with different levels of vacation pay and severance benefits solely on account of their gender—"an absurd proposition that the Legislature surely did not intend." *Pachter*, *supra*, 10 N.Y.3d at 615.

184.   Finally, even if there were room for doubt, "all doubts [regarding statutory exceptions] should be resolved in favor of the general provision rather than the exception . . ." *Van Amerogen v. Donnini*, 78 N.Y.2d 880, 882 (1991), citing McKinney's Cons.Laws of N.Y., Book 1, Statutes § 213.

185.   Accordingly, Defendants are liable under NYLL §§ 190, 193, 198(3) and 198(1-a) for Jensen's accrued vacation pay (864 hours' worth), accrued personal time pay (72 hours' worth), and severance pay ($550,000), plus liquidated damages and attorney's fees.

## Limited Liability Company Law § 609(c) Demand

Pursuant to New York Limited Liability Company Law § 609(c), Plaintiff hereby provides notice to the ten members with the largest percentage ownership interest in Defendants, as determined as of the beginning of the period during which the unpaid services referred to in this section are performed, that Plaintiff intends to hold them personally liable, jointly and severally, for all debts, wages or

salaries due and owing to Plaintiff for services performed by him for Defendants.
Although Plaintiff believes this notice to be sufficient to constitute notice to said
top ten members under Limited Liability Company Law § 609(c), Plaintiff, out of
an abundance of caution, hereby demands that Defendants furnish the names and
addresses of their respective ten members with the largest percentage ownership
interest, so that a separate notice may be provided to each of them individually.

**WHEREFORE**, Jensen respectfully requests judgment requiring
Defendants to pay:

(A)   Jensen's 2017 Profits Bonus, in an amount not less than
      $423,476;

(B)   Jensen's 2018 Accrued Profits Bonus, in an amount to be
      determined after the Healthcare Advisors' 2018 financials have
      been provided;

(C)   Jensen's Accrued Benefits, based on the above-referenced
      accrued vacation and personal days;

(D)   Jensen's Severance Pay (in the amount of $550,000);

(E)   Attorney's Fees and Costs under Section 9(b) of the
      Employment Agreement in connection with Jensen's first cause
      of action;

(F)   100% liquidated damages plus attorney's fees under NYLL §§
      198(3) and 198(1-a) in connection with Jensen's second, third
      and fourth causes of action; and

(G)   Prejudgment interest, costs, disbursements, and such other
relief as may be just and proper.

Dated:      New York, New York
January 22, 2019

Law Offices of Scott A. Lucas

By:   */S/ Scott A. Lucas*
Scott A. Lucas (SL-6316)
250 Park Avenue
20th Floor
New York, New York 10177
(212) 983-6000
*Attorneys for Plaintiff W. Todd Jensen*

44